UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 JAN -7 PM 3: 24

BY_____
DEPUTY CLERK

| | |
|---|---|
| A.H., by and through her parents and natural guardians, James Hester and Darlene Hester; JAMES HESTER, individually; DARLENE HESTER, individually; E.R., by and through her parents and natural guardians, Chad Ross and Angela Ross; CHAD ROSS, individually; ANGELA ROSS, individually; A.F., by and through her parents and natural guardians, Daniel Foley and Juliane Foley; DANIEL FOLEY, individually; JULIANE FOLEY, individually; C.R., by and through her parents and natural guardians, Gilles Rainville and Elke Rainville; GILLES RAINVILLE, individually; ELKE RAINVILLE, individually; and the ROMAN CATHOLIC DIOCESE OF BURLINGTON, VERMONT, <br><br>     Plaintiffs, <br><br> v. <br><br> DANIEL M. FRENCH, in his official capacity as Secretary of the Vermont Agency of Education; MICHAEL CLARK, in his official capacity as Grand Isle Supervisory Union Superintendent; the SOUTH HERO BOARD OF SCHOOL DIRECTORS; the CHAMPLAIN ISLAND UNIFIED SCHOOL DISTRICT BOARD OF SCHOOL DIRECTORS; JAMES TAGER, in his official capacity as Franklin West Supervisory Union Superintendent; and the GEORGIA BOARD OF SCHOOL DIRECTORS, <br><br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> Case No. 2:20-cv-151 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**
(Doc. 21)

Minor plaintiff A.H., her parents James and Darlene Hester, minor plaintiff E.R., her parents Chad and Angela Ross, minor plaintiff A.F., her parents Daniel and Juliane Foley, minor plaintiff C.R., her parents Gilles and Elke Rainville, and the Roman Catholic Diocese of Burlington, Vermont (the "Diocese of Burlington") (collectively, "Plaintiffs") bring this action against Defendants Daniel M. French ("Defendant French") in his official capacity as Secretary of the Vermont Agency of Education ("AOE"), Michael Clark in his official capacity as Superintendent of the Grand Isle Supervisory Union School District ("GISUSD"), the South Hero Board of School Directors, the Champlain Islands Unified Union School District ("CIUUSD") Board of Directors, James Tager in his official capacity as Franklin West Supervisory Union Superintendent, and the Georgia Board of School Directors (collectively, the "School Defendants").[1] In their First Amended Verified Complaint, Plaintiffs allege three claims: a violation of Plaintiffs' Free Exercise of Religion rights by all Plaintiffs against all Defendants (Count I); a claim by the Diocese of Burlington that Defendants violated its First Amendment right to Freedom of Expression (Count II); and a claim by all Plaintiffs against all Defendants for violation of Plaintiffs' constitutional right to Equal Protection (Count III). In their prayer for relief, Plaintiffs seek declaratory and injunctive relief, as well as an award of compensatory damages, attorney's fees, and costs.

In their motion for a preliminary injunction, Plaintiffs allege Defendants denied their applications for funds from the State of Vermont's statutory program (the "Town Tuition Program") solely because of the religious affiliation of Rice Memorial High School ("RMHS"). They ask the court:

> to enjoin Defendants, Defendants' officers, agents, employees, and all other persons acting in concert with them, from applying Vermont law, including the Vermont Constitution's Compelled Support Clause, Vt. Const. Ch. I, art. III—or any interpretation thereof—to deprive the Plaintiff families of access to town tuition benefits under Title 16 of the Vermont Statutes, and

---

[1] In *A.M. v. French*, the plaintiffs did not bring claims against the school districts that denied tuition payments for a dual enrollment program at RMHS. Here, in contrast, Plaintiffs bring claims directly against the School Defendants who denied their tuition reimbursement requests.

the Catholic Diocese of Burlington from receiving such benefits in
violation of the First Amendment's Free Exercise Clause.

(Doc. 21 at 3.)

On December 9, 2020, Defendants opposed the motion, and on December 13, 2020, Plaintiffs replied. The court heard oral argument on December 14, 2020 and admitted as evidence the parties' declarations and exhibits. Neither party sought to present testimony. Pursuant to Fed. R. Evid. 201, the School Defendants made an unopposed request for judicial notice of certain excerpts from the RMHS website. The court took judicial notice of the RMHS website and the 2019-2020 Course Viewbook in their entirety.

Defendant French agrees that neither Vermont's Constitution nor *Chittenden Town School District v. Department of Education*, 738 A.2d 539 (Vt. 1999) precludes payments under the Town Tuition Program to religiously affiliated schools. He contends that he neither denied Plaintiffs' tuition reimbursement requests nor had any role in the decision-making. Instead, pursuant to Vermont's statutory framework, he contends that decision was made solely by the School Defendants.

The School Defendants, in turn, argue that they followed the advice of legal counsel in denying reimbursement payments for RMHS. They assert that "[i]t appears the protected right these Plaintiffs seek to have vindicated is the right to a religious education at public expense." (Doc. 28 at 6.) They claim no such right exists. In the alternative, they contend that any injury Plaintiffs have suffered can be remedied by an award of damages because Plaintiffs continue to practice their religion.

Plaintiffs are represented by David A. Cortman, Esq., Paul D. Schmitt, Esq., Ryan J. Tucker, Esq., and Thomas E. McCormick, Esq. Defendant French is represented by Assistant Attorneys General Jon T. Alexander and Rachel E. Smith, and the remaining Defendants are represented by William F. Ellis, Esq.

I.    **Vermont's Constitution, the Town Tuition Program, and *Chittenden Town* and its Progeny.**

Before rendering its findings of fact, the court examines the constitutional and statutory framework surrounding Plaintiffs' claims.

Vermont's Constitution provides:

> That all persons have a natural and unalienable right, to worship Almighty God, according to the dictates of their own consciences and understandings, as in their opinion shall be regulated by the word of God; *and that no person ought to, or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any minister, contrary to the dictates of conscience[.]*

Vt. Const. ch. I, art. 3 (emphasis supplied). The latter clause is commonly referred to as the "Compelled Support Clause."

Vermont statutes create a Town Tuition Program that provides tuition to students who live in towns without public schools so that those students can obtain a publicly funded education. Under Vermont law,

> (1) A school district may both maintain a high school and furnish high school education by paying tuition:
>
> (A) to a public school as in the judgment of the school board may best serve the interests of the students; or
>
> (B) to an approved independent school or an independent school meeting education quality standards if the school board judges that a student has unique educational needs that cannot be served within the district or at a nearby public school.
>
> (2) *The judgment of the [school] board shall be final in regard to the institution the students may attend at public cost.*

16 V.S.A § 822(c) (emphasis supplied).

The Vermont Board of Education determines which schools are "approved independent schools":

> To become an approved independent school, the school must: (1) offer elementary or secondary education; (2) provide a prescribed minimum course of study; and (3) "substantially" comply with Vermont Board of Education rules for approved independent schools. 16 V.S.A. § 166(b). The rules must at a minimum require "that the school has the resources required to meet its stated objectives, including financial capacity, faculty who are qualified by training and experience in the areas in which they are assigned, and physical facilities and special services that are in accordance with any state or federal law or regulation." *Id.*

*Chittenden Town*, 738 A.2d at 545.

4

The Vermont Supreme Court has described the Town Tuition Program as "quite simple." *Id.* at 544. If a town school district "provides elementary education, it is required to provide secondary education." *Id.* (citing 16 V.S.A. § 822(a)). A town "has a number of options in meeting this obligation. The two main ones are to maintain a public high school or to pay tuition 'to an approved public or independent high school, to be selected by the parents or guardians of the pupil, within or without the state.'" *Id.* (quoting 16 V.S.A. § 822(a)-(b)). "Neither the [Town Tuition Program] nor the rules deal with sectarian education[]" and "neither the statute nor the rules deal with the religious part of the curriculum of a sectarian school." *Id.* at 545. There is thus "no limit on the quantity and nature of sectarian subjects[]" nor is there any requirement that "sectarian education be separated from secular education. It is [therefore] entirely possible that the majority of the education in an approved independent school will be in religious tenets and doctrine." *Id.*

In *Chittenden Town*, the Vermont Supreme Court "consider[ed] the constitutional implications of the [Town Tuition Program] authorizing school districts to provide high school education to their students by paying tuition for nonpublic schools selected by their parents." *Chittenden Town*, 738 A.2d at 541 (citing 16 V.S.A. §§ 822, 824). Having concluded in a prior case that "the Establishment Clause of the United States Constitution was not an impediment to the reimbursement at public expense of tuition paid to a sectarian school[,]" the Vermont Supreme Court addressed only "whether the tuition reimbursement scheme transgresses the Compelled Support Clause of the Vermont Constitution, Vt. Const. ch. I, art. 3, which speaks not to establishment of religion but to state support of religious worship." *Id.*

Holding "that a school district violates Chapter I, Article 3 [of Vermont's Constitution] when it reimburses tuition for a sectarian school under [16 V.S.A.] § 822 in the absence of adequate safeguards against the use of such funds for religious worship[,]" *id.* at 541-42, the Vermont Supreme Court observed that "Article 3 is not offended . . . unless the compelled support is for the 'worship' itself." *Id.* at 550. As a result, the constitutional defect to be remedied in Vermont's Town Tuition Program is the absence

of "restrictions that prevent the use of public money to fund religious education." *Id.* at 562 (observing the court saw "no way to separate religious instruction from religious worship").

To the extent that *Chittenden Town* may be misread as precluding all payments of public funds to religious schools, the Vermont Supreme Court specifically disavowed that interpretation:

> Because we have concluded that Chittenden's tuition payments to religious schools violate Article 3, [the Compelled Support Clause,] we must address plaintiff's additional contention that such an outcome violates the Free Exercise Clause of the First Amendment. It plainly does not. *The Free Exercise argument is premised on plaintiff's assumption that we would conclude that children who attend religious schools may not receive public educational funding, while children who attend public schools may. This is not our ruling. We have determined only that public funds may not pay for religious worship within the meaning of Article 3, wherever it occurs.*

*Id.* at 563 (emphasis supplied).

The Vermont Supreme Court acknowledged that "adequate safeguards" and "appropriate restrictions[]" could render publicly funded tuition payments to religious schools constitutionally permissible. *Chittenden Town*, 738 A.2d at 542, 564. It has cautioned that *Chittenden Town* is a "narrow ruling" whose "most critical lesson . . . is that the fact that the recipient of government support is a religious organization is not itself determinative[;] . . . whether the funds are used to support religious worship is the critical question." *Taylor v. Town of Cabot*, 2017 VT 92, ¶ 23, 205 Vt. 586, 597-98, 178 A.3d 313, 320 (observing that *Chittenden Town* does not prevent "children who attend religious schools" from "receiv[ing] public educational funding"). The Vermont Supreme Court has recognized that there are "myriad ways that a public school district can subsidize education in a religious school[.]" *Chittenden Town*, 738 A.2d at 562.

## II.     Findings of Fact.

The court makes the following factual findings by a preponderance of the evidence:

1.     The minor Plaintiffs and their parents live in school districts that permit them to participate in the Town Tuition Program.

6

2.  RMHS is an approved independent school recognized by the Vermont State Board of Education and the AOE. It "is a Roman Catholic school that exists to guide its students toward the realization of their God-given potential." (Doc. 21-15 at 2, ¶ 6.) RMHS's tuition rate of approximately $11,600 per year is more affordable than the tuition of many other approved independent schools participating in the Town Tuition Program. As Plaintiffs point out, the affordability of RMHS supports a conclusion that the School Defendants' denial of tuition reimbursement was not motivated by financial concerns.

3.  RMHS is owned and operated by Plaintiff Diocese of Burlington, which exercises its religion by operating RMHS as a "ministry" "which provides academic instruction that is faithful to the teachings of the Catholic Church." *Id.* at ¶¶ 4-5.

4.  The minor Plaintiffs' desire to attend RMHS is an exercise of their own and their parents' religious faith.

5.  The School Defendants have denied tuition payments for the minor Plaintiffs' attendance at RMHS solely because of that school's religious affiliation. For example,

    a.  When the Hesters requested tuition reimbursement from GISUSD for A.H., they were denied because "Rice is a religious school for which [GISUSD] do[es] not pay tuition." (Doc. 21-3 at 2.) In denying the request, GISUSD relied on its attorney's advice and information contained on the website of EdChoice, a nonprofit organization, which stated that under Vermont's Town Tuition Program, "[t]he sending town pays school tuition directly to the receiving school, which can be any public or private, *non-religious* school in or outside Vermont." *Id.* (emphasis in original) (internal quotation marks omitted).

    b.  In response to the Rosses' application for Town Tuition Program funds for E.R.'s attendance at RMHS, Defendant Clark stated that "[t]he reason your request for the CIUUSD to pay tuition at [RMHS was denied] is the Vermont Constitution bars public payments to religious institutions." *Id.* at 9. Defendant Clark stated it "is considered state support for religion" and cited a legal opinion from the CIUUSD's attorney that purportedly supported that conclusion. *Id.*

    c.  According to the Rainville family, C.R.'s education at Bellows Free Academy is currently funded through the Town Tuition Program. The Georgia Board of School Directors denied C.R.'s tuition reimbursement request for RMHS because it "is a religious school."

7

(Doc. 21-13 at 3.)

    d.    A.F., who currently attends RMHS, was denied a tuition reimbursement by GISUSD because RMHS "is a religious school." (Doc. 21-16 at 3.)

6.    In denying RMHS tuition reimbursement requests for the minor Plaintiffs, the School Defendants did not ask RMHS how its religious worship activities are funded or whether tuition could be apportioned between secular and religious education.

7.    The Diocese of Burlington "covers the expenses of Masses held at [RMHS], which are the school's religious worship events." Plaintiffs contend that "only $200-$300 per year[]" is attributable to RMHS's chapel and its public Masses. (Doc. 21-15 at 4, ¶¶ 25-26.) It is not clear whether this amount covers utilities, heat, and cleaning. If so, it appears insufficient. Without a further explanation, the court cannot credit it.[2]

8.    Plaintiffs contend that "[s]tudent tuition does not fund [RMHS's] worship activities[]" and RMHS's "chaplains are not paid a salary from [RMHS]." *Id.* at ¶¶27-28. Plaintiffs do not address whether Plaintiff Diocese of Burlington pays for religious education courses at RMHS or whether that cost is covered by donations.

9.    The School Defendants claim that RMHS's website makes it clear that it would be difficult, if not impossible, to segregate religious education from secular courses at RMHS. They do not further claim they undertook that task.

10.    The RMHS website indicates that RMHS's faculty "strives to ensure each course meets [its] mission of inspiring students to love learning, serve others, and seek God."[3]

11.    RMHS's 2019-2020 Course Viewbook states that "[a]s a Roman Catholic school, [RMHS] exists to guide its students toward the realization of their God-given potential. [RMHS] teaches students to recognize and develop their gifts by inspiring them to love learning, to serve others and to seek God through Jesus Christ and his Church."[4]

---

[2] "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (internal quotation marks omitted). The court need not accept as true factual allegations that are unsupported by reliable, admissible evidence. *See Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011).

[3] https://rmhsvt.org/course-offerings (last visited Dec. 16, 2020).

[4] https://d2y1pz2y630308.cloudfront.net/24848/documents/2019/12/viewbook.pdf (last visited

12. RMHS offers secular educational courses as well as courses offered by its "Religion Department" including "Scripture," "Catholic Faith and Sacraments," "Morality & Social Justice," "Catholicism Today," "Love and Life Choices," and "Art and Spirituality."[5]

13. Defendant French acknowledges that:

> *Chittenden* [*Town*] did <u>not</u> prohibit public funding of all "education [that] occurs in a religious school" and thus did not disapprove "the myriad ways that a public school district can subsidize education in a religious school by paying for expenses that occur whether or not the school was sectarian," such as "payments for school transportation to sectarian schools . . . text books used in sectarian schools . . . or teachers of secular subjects to sectarian school children." 738 A.2d at 562 (internal citations omitted).
>
> * * *
>
> In this way, *Chittenden* [*Town*] suggested, the religious school and sending district <u>can</u> safeguard against the risk that "the public and private sources of revenue are commingled so that each supports religious education." *Id.* This approach ensures that publicly funded tuition payments <u>can</u> be made to religious schools that "clearly cover[] only the cost of secular educational expenses" at the religious school, *id.* at 562, such as "education on secular subjects required in the state's minimum course of study," *id.* at 546, and which thereby comply with the Compelled Support Clause.

(Doc. 29 at 3-4) (emphasis and omissions in original).

14. From 2001 through 2019, at least thirty-five school districts have elected in at least eighty-two instances to pay tuition pursuant to the Town Tuition Program to twenty-two different independent high schools that have an apparent or declared religious affiliation. In 2018, only one of the 1,735 publicly funded students attended an approved independent school in Vermont. In 2016, out of 1,664 students, there were none.

15. Plaintiffs contend that Defendant French has provided inconsistent and

---

Dec. 16, 2020).

[5] The court agrees with Plaintiffs that RMHS's website and course offerings have limited relevance in determining the factual basis for the School Defendants' decision because there is no evidence that the School Defendants consulted these materials in denying Plaintiffs' tuition reimbursement requests. However, these materials remain relevant to the availability and scope of injunctive relief.

incorrect guidance regarding the import of *Chittenden Town*, including in an August 26, 2020 email in which his representative stated: "I checked with the [AOE's] legal team and was told there is no change in a district's ability to pay tuition to a parochial school. The Chittenden decision still stands. I trust this information answers your question." (Doc. 29-1 at 4.)

16. Plaintiffs further contend that Defendant French and the AOE have a history of providing incorrect guidance regarding the proper interpretation of *Chittenden Town* which has contributed to a violation of their Free Exercise rights.[6]

17. In their First Amended Verified Complaint, Plaintiffs allege that Defendant Tager consulted with "[Defendant] French of the [AOE]" before he urged the denial of the Rainvilles' and the Foleys' tuition requests. (Doc. 16 at 33, ¶¶ 301-02) (internal quotation marks omitted). Defendant French disputes this claim and avers that he "never withheld, or indicated that he would withhold, a district's State educational funding because the district paid tuition to a religious school." (Doc. 29 at 5) (citing Doc. 29-1 at 3, ¶ 7.) In the absence of an evidentiary hearing and a credibility determination, the court cannot resolve this dispute of fact.

18. Defendant French points out that, although Plaintiffs have collected emails of past instances of incorrect advice regarding the impact of *Chittenden Town*, not "a single one was ever sent to or received by any of the superintendent and school board member Defendants." (Doc. 29 at 7.) On this basis, he contends that there is "no specific evidence causally connecting AOE or Secretary French with the recent decisions [regarding

---

[6] *See, e.g.*, Doc. 21-10 at 2 (explaining in January 23, 2019 email that "schools that are approved to receive public tuition dollars from school districts . . . [as] an approved independent school . . . must be: 1) non-sectarian, and 2) maintain an accredited curriculum"); *id.* at 37 (August 9, 2013 email from AOE deputy secretary and chief financial officer informing school district official that "[s]ome approved independent schools are run by religious organizations. If the school is pervasively religious the Vermont Supreme Court has held that public funds cannot be used so districts would not be able to pay tuition to those schools."); *id.* at 24 (March 9, 2012 email in which AOE official announced "[t]here is no provision for public funds to be paid to schools with religious affiliations"); *id.* at 27 (December 27, 2010 email from AOE official to school district official stating "parents and students may choose any approved public high school or approved independent school, though not a religious school."); *id.* at 32 (Spring 2010 AOE summary of Vermont school choice options noting "school boards pay tuition to public or approved independent schools that parents choose, within or outside Vermont, not including religious schools"); Doc. 38 at 6 n.1 (quoting *State Regulation of Private Schools*, U.S. Dep't of Educ. at 282 (2009), *available at* https://perma.cc/8QU2-R5WF (thanking AOE's independent school consultant for confirming that "[r]eligious schools may not be designated by school districts and tuition charges cannot be paid to the religious school. *Chittenden Town School District v. Vermont Department of Education*, 738 A.2d 539 (Vt.1999).").

Plaintiffs' tuition reimbursement requests.]" *Id.*

19.   Neither Defendant French nor his representatives participated in the School Defendants' decision to deny Plaintiffs' requests for tuition reimbursement. There is also no evidence that the School Defendants sought guidance from Defendant French in making those determinations.

## III.   Conclusions of Law and Analysis.

In their pending motion, Plaintiffs ask the court to order Defendants to comply with applicable law and to refrain from depriving Plaintiffs of tuition reimbursement payments solely because of RMHS's religious affiliation. They do not ask the court to strike down the Compelled Support Clause or invalidate the Town Tuition Program. The court agrees with the parties that the Compelled Support Clause, as interpreted by *Chittenden Town*, does not conflict with the Free Exercise Clause, as interpreted by *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020). Accordingly, at issue is only whether injunctive relief is warranted and whether it can be narrowly tailored to prevent an ongoing violation of Plaintiffs' Free Exercise rights.

### A.   Standard of Review.

A party seeking a preliminary injunction must "generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." *A.C.L.U. v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). Although in some cases a "sufficiently serious question[] going to the merits of [a] claim" may suffice, a plaintiff cannot rely on the more lenient "serious questions" standard where he seeks to "challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (internal quotation marks and citation omitted).

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citations and internal quotation marks omitted).

As a threshold issue, the court considers whether the injunctive relief sought is mandatory or prohibitory and whether it would grant the moving party all of its requested relief. As the Second Circuit has explained:

> [W]e have required the movant to meet a higher standard where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.
>
> * * *
>
> The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act. . . . [T]his distinction is important because we have held that a mandatory injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief. The clear or substantial showing requirement—the variation in language does not reflect a variation in meaning—thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success.
>
> * * *
>
> A heightened standard has also been applied where an injunction—whether or not mandatory—will provide the movant with substantially all the relief that is sought. . . . If the use of a heightened standard is to be justified, the term "all the relief to which a plaintiff may be entitled" must be supplemented by a further requirement that the effect of the order, once complied with, cannot be undone. A heightened standard can thus be justified when the issuance of an injunction will render a trial on the merits largely or partly meaningless[.]

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33-35 (2d Cir. 1995) (internal quotation marks and citations omitted).

In this case, Plaintiffs seek to enjoin Defendants from impermissibly interpreting Vermont law in a manner that deprives them of access to Town Tuition Program benefits. As such, their request for injunctive relief will not alter the status quo because it would only command Defendants to do what they are already required to do—comply with

applicable law. Cabined in this manner, Plaintiffs' request for injunctive relief is limited, narrow, and would not negate the need for a trial on the merits.

### B. Whether Plaintiffs Have Established Irreparable Harm.

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction[.]" *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983) (internal quotation marks omitted). Irreparable harm means "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (internal quotation marks omitted). There is also a "general proposition that irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial." *Tom Doherty Assocs., Inc.*, 60 F.3d at 38.

If Plaintiffs prove their claim of religious discrimination, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury[,]" *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and "denial of [a] plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). However, "[e]ven when a complaint alleges First Amendment injuries, . . . irreparable harm is not presumed and must still be shown." *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008).

Plaintiffs' ability to establish irreparable harm turns on whether they can demonstrate that Defendants have impaired their Free Exercise rights by denying tuition reimbursement payments to RMHS. If Plaintiffs establish a likelihood of success on the merits, the essential requirement of irreparable harm will be satisfied. In other words, "[b]ecause the violation of a constitutional right is the irreparable harm asserted here, the two prongs of the preliminary injunction threshold merge into one: in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000).

13

**C.    Whether Plaintiffs Can Establish a Likelihood of Success on the Merits.**

**1.    Plaintiffs' Free Exercise Claims Against Defendant French.**

Defendant French argues that Plaintiffs have failed to demonstrate a likelihood of success on the merits with regard to their claims against him because neither he nor the AOE caused their injuries. As he points out, under 16 V.S.A. § 828, it is the "decision of a school board" to determine "eligibility for tuition payments, the amount of tuition payable, or the school [a student] may attend[.]" While that decision is appealable to the State Board of Education, the statute makes no reference to the involvement of Defendant French or the AOE.

The Vermont Supreme Court has observed that:

> [a]lthough the relevant statutes allow school districts to pay tuition on behalf of a resident who is a student in any approved private school, the *districts* must determine whether such a payment violates the Establishment Clause. *This responsibility rests upon them*, and not the State Board, except as a matter of appellate review.

*Campbell v. Manchester Bd. of Sch. Dirs.*, 641 A.2d 352, 356 (Vt. 1994) (emphasis supplied). Similarly, this court has previously held that "Defendant [French] does not control the determinations made by local school districts regarding whether to fund an independent high school that is 'approved' by the State Board of Education pursuant to 16 V.S.A. § 166(b)." *A.M. v. French*, 2020 WL 2786446, at *4 (D. Vt. May 29, 2020).

Notwithstanding a statutory scheme that authorizes only school boards to decide whether to grant tuition requests under the Town Tuition Program, Plaintiffs assert that Defendant French and his predecessors have sown the confusion that has led to an infringement of their Free Exercise rights. They point out that despite ample opportunity and time in which to do so, the AOE has failed to provide authoritative guidance as to how adequate safeguards may be imposed to ensure that public funds are not used to fund religious worship. Defendant French contends that, even crediting these facts as true, they cannot establish standing if the decisions that caused Plaintiffs' injuries were made solely by the School Defendants.

14

"Standing is a federal jurisdictional question 'determining the power of the court to entertain the suit.'" *Carver v. City of N.Y.*, 621 F.3d 221, 225 (2d Cir. 2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "A party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). "Thus, in order to seek injunctive relief, a plaintiff must show the three familiar elements of standing: injury in fact, causation, and redressability." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011).

Although standing is not available for an injury that is "the result of the independent action of some third party[,]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and alterations omitted), "[a] defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55-56 (2d Cir. 2016). Stated differently, "a plaintiff's injury need not be 'directly' attributable to a defendant in order to show the causation element of standing to sue that defendant, so long as the injury is 'fairly traceable' to that defendant." *Id.* at 59. At the pleading stage, this is not "an onerous standard" *id.* at 55 and is a "relatively modest" burden to meet. *Bennett v. Spear*, 520 U.S. 154, 171 (1997). However, "[w]hen a preliminary injunction is sought, a plaintiff's burden to demonstrate standing 'will normally be no less than that required on a motion for summary judgment.'" *Cacchillo*, 638 F.3d at 404 (quoting *Lujan v. Nat'l Wildlife Fed'n (Lujan I)*, 497 U.S. 871, 907 n.8 (1990)).

Under Vermont law, individual school boards decide whether Town Tuition Program funds will be paid to an approved independent school. *See* 16 V.S.A. § 822(c); *see also Campbell*, 641 A.2d at 356. Defendant French does not participate in these decisions and has no authority to override them. Standing is generally not found in such circumstances. *See, e.g.*, *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (finding that plaintiffs lacked standing to sue Florida's Secretary of State where "Florida law tasks the Supervisors, independently of the Secretary, with printing

15

the names of candidates on ballots in the order prescribed by the ballot statute"). Although in the past, the AOE may have provided incorrect or misleading guidance regarding *Chittenden Town*, there is no evidence that it did so in this case. There is also no evidence that "[Defendant French's] actions have had a determinative or coercive effect on" the School Defendants for purposes of Plaintiffs' tuition reimbursement requests. *Nat'l Council of La Raza v. Mukasey*, 283 F. App'x 848, 852 (2d Cir. 2008).

Plaintiffs' further argument that their injuries are caused by Defendant French because he is generally responsible for supervising the expenditure of funds for public schools under 16 V.S.A. § 212 is similarly unavailing. Plaintiffs provide no evidence that Defendant French used his general authority to cause the School Defendants to deny Plaintiffs' tuition reimbursement requests. *See Jacobson*, 974 F.3d at 1254 (holding that "[i]n the absence of any evidence that the Secretary controls ballot order, the [plaintiffs] likewise cannot rely on the Secretary's general election authority to establish traceability").

Finally, Plaintiffs' request for an injunction against Defendant French will not redress their harm. It is the School Defendants' determinations they challenge, and it is the School Defendants alone that have the authority to approve their RMHS tuition requests. Because Plaintiffs have not established their standing to bring claims against Defendant French in the context of a preliminary injunction, Plaintiffs' request to enjoin Defendant French must be DENIED.

### 2. Plaintiffs' Free Exercise Claims Against the School Defendants.

Plaintiffs claim that the School Defendants violated their constitutional right to the free exercise of their religion by denying their tuition reimbursement requests solely because of RMHS's religious affiliation. "The Free Exercise Clause of the First Amendment, applied against the states by incorporation into the Fourteenth Amendment, provides that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014) (citation omitted) (quoting U.S. Const. amend. I). It "protects religious observers against unequal treatment

and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status." *Trinity Lutheran Church of Columbia, Inc. v. Comer (Trinity Lutheran)*, 137 S. Ct. 2012, 2019 (2017) (alteration and internal quotation marks omitted). "Applying that basic principle, [the Supreme Court] has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest of the highest order." *Id.* (internal quotation marks omitted). This includes any "automatic and absolute exclusion from the benefits of a public program for which [the plaintiff was] otherwise fully qualified." *Id.* at 2022.

In *Espinoza*, the Supreme Court struck down Montana Constitution's "no-aid" provision, which states:

> [t]he legislature, counties, cities, towns, school districts, and public corporations shall not make any direct or indirect appropriation or payment from any public fund or monies, or any grant of lands or other property for any sectarian purpose or to aid any church, school, academy, seminary, college, university, or other literary or scientific institution, controlled in whole or in part by any church, sect, or denomination[,]

Mont. Const., art. X, § 6(1). The Supreme Court determined that Montana's "no-aid" provision violated the Free Exercise Clause because it barred "religious schools from public benefits solely because of the religious character of the schools[]" and "plainly exclude[d] schools from government aid solely because of religious status[,]" a decision that "turn[ed] expressly on religious status and not religious use." *Espinoza*, 140 S. Ct. at 2255-56 (internal quotation marks omitted).

Unlike in *Espinoza*, where "[t]o be eligible for government aid under the Montana Constitution, a school must divorce itself from any religious control or affiliation[,]" *id.* at 2256, the Vermont Supreme Court's ruling in *Chittenden Town* left open the possibility of state funding of religious schools provided there were "adequate safeguards against the use of such funds for religious worship." 738 A.2d at 542. *Chittenden Town* thus does not *require* the School Defendants to refuse to reimburse tuition payments to RMHS. Quite the contrary, it affirmatively recognized that such payments may be harmonized with the

17

Compelled Support Clause provided certain restrictions are imposed. *See Taylor*, 2017 VT 92, at ¶ 23, 205 Vt. at 597, 178 A.3d at 320 (observing that *Chittenden Town* does not "prevent[]" children who attend religious schools from "receiv[ing] public educational funding.").

After *Espinoza*, it is clear "that discrimination in handing out school aid based on the recipient's affiliation with or control by a religious institution differ[s] from discrimination in handing out that aid based on the religious use to which the recipient would put it." *Carson v. Makin*, 979 F.3d 21, 38 (1st Cir. 2020).[7] Because *Chittenden Town* prohibits only religious use, it does not conflict with *Espinoza*.

The School Defendants denied tuition reimbursement payments to RMHS solely because of its religious affiliation. In doing so, they did not ask how religious worship and education are funded at RMHS. They also did not consider whether there were adequate safeguards to ensure that public funds were not used to fund religious worship. To the extent the School Defendants were motivated by a well-intentioned desire to avoid a violation of Vermont's Compelled Support Clause, "[s]tatus-based discrimination remains status based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses." *Espinoza*, 140 S. Ct. at 2256. It is therefore not a defense to assert a concern that "[g]eneral school aid . . . could be used for religious ends by some recipients, particularly schools that believe faith should 'permeate[]' everything they do." *Id.* (second alteration in original).

"When otherwise eligible recipients are disqualified from a public benefit 'solely

---

[7] In *Carson v. Makin*, the First Circuit found Maine's statutory "nonsectarian" requirement "imposes a use-based restriction[]" that "unlike the one at issue in *Espinoza*, does not bar schools from receiving funding simply based on their religious identity" but rather "targets only the use of the tuition assistance for sectarian instruction itself." *Carson v. Makin*, 979 F.3d 21, 37-38, 40, 44 n.11 (1st Cir. 2020). This type of provision is constitutionally permissible because it "neither punishes a recipient solely for being controlled by or affiliated with a religious institution nor imposes a penalty for doing religious things." *Id.* at 44 (internal quotation marks omitted). Although "affiliation or association with a church or religious institution is one potential indicator of a sectarian school, it is not dispositive. The Department's focus is on what the school teaches through its curriculum and related activities, and how the material is presented." *Id.* at 38 (emphasis in original).

because of their religious character,' [the court] must apply strict scrutiny." *Id.* at 2260 (quoting *Trinity Lutheran*, 137 S. Ct. at 2021). To satisfy strict scrutiny, "a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (internal quotation marks omitted). A state's "policy preference for skating as far as possible from religious establishment concerns[]" is not a state interest "of the highest order" because "achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution . . . is limited by the Free Exercise Clause." *Trinity Lutheran*, 137 S. Ct. at 2024 (quoting *Widmar v. Vincent*, 454 U.S. 263, 276 (1981)).

Because the School Defendants' decisions "turn[ed] expressly on religious status and not religious use[,]" *Espinoza*, 140 S. Ct. at 2256, they "cut[] families off from otherwise available benefits [merely because] they choose a religious private school rather than a secular one, and for no other reason." *Id.* at 2261. The School Defendants' denial of Plaintiffs' tuition reimbursement requests thus does not survive strict scrutiny. Plaintiffs have therefore established a substantial likelihood that they will prevail on the merits of their Free Exercise claims against the School Defendants.

**D.    Whether the Balance of Hardships and the Public Interest Favor Injunctive Relief.**

"Where the [g]overnment is the opposing party, the final two factors in the [preliminary injunction] analysis—the balance of the equities and the public interest— merge." *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020). For this reason, a plaintiff "seek[ing] to enjoin the activity of a government agency[] . . . must contend with the well-established rule that the [g]overnment has traditionally been granted the widest latitude in the dispatch of its own internal affairs[.]" *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) (internal quotation marks omitted).

Absent a preliminary injunction, Plaintiffs will continue to be deprived of their constitutionally protected right to the free exercise of their religion. While a court must tread with caution when asked to interfere in a municipal entity's fulfillment of its

statutory duties, the School Defendants have no legitimate interest in withholding a public benefit based on a misinterpretation of *Chittenden Town*. To the contrary, "securing First Amendment rights is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). An injunction prohibiting the School Defendants from denying tuition reimbursement payments to RMHS solely based on its religious affiliation is thus consistent with the public interest.

The scope of available injunctive relief, however, remains limited. This court cannot simply order the School Defendants to honor Plaintiffs' RMHS tuition requests. To do so would be to ignore ample evidence that at least some of the courses offered by RMHS consists of religious education. Nor can the court accept Plaintiffs' invitation to order that all tuition reimbursements be paid to them. Unlike in *Espinoza*, payments under the Town Tuition Program are not funds that make their "way to religious schools only as a result of [parents] independently choosing to spend their [tuition] at such schools." *Espinoza*, 140 S. Ct. at 2254. Instead, the Town Tuition Program grants only a sending school board decision-making authority. *See* 16 V.S.A. § 822(c)(2) ("The judgment of the [school] board shall be final in regard to the institution the students may attend at public cost."). As the Vermont Supreme Court has observed:

> [T]he United States Supreme Court may well decide that the intervention of unfettered parental choice between the public funding source and the educational provider will eliminate any First Amendment objection to the flow of public money to sectarian education. We cannot conclude, however, that parental choice has the same effect with respect to Article 3. If choice is involved in the Article 3 equation, *it is the choice of those who are being required to support the religious education*, not the choice of the beneficiaries of the funding.

*Chittenden Town*, 738 A.2d at 563 (emphasis supplied). Parental choice therefore does not obviate Compelled Support Clause concerns.

The court would also overstep its authority if it fashioned "appropriate safeguards" on behalf of the School Defendants. It agrees with Plaintiffs that the court "should not . . . try to do Defendants' job for them." (Doc. 34 at 3); *see also Jacobson*, 974 F.3d at 1257 (ruling that it would "raise[] serious federalism concerns, and it is doubtful that a federal

20

court would have authority to order it[]" if it directed a state official to promulgate a rule or regulation to address a challenged statute).

Because a preliminary injunction is an extraordinary remedy, the court must narrowly tailor the relief granted to the harm likely to occur. In this case, that means the court must order the School Defendants to refrain from denying Plaintiffs' tuition reimbursement requests solely because of RMHS's religious affiliation, but it must tread no further in determining how the decision should be made.

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction against the School Defendants is GRANTED IN PART. (Doc. 21.)

## PRELIMINARY INJUNCTION

1. During the pendency of this litigation and until a trial on the merits, unless otherwise ordered by the court, the School Defendants are hereby ENJOINED from denying Plaintiffs' applications for Town Tuition Program reimbursement solely on the basis of RMHS's religious status.

2. This injunction binds the School Defendants as well as their officers, agents, servants, employees, and attorneys.

3. The court determines that no security is necessary under Fed. R. Civ. P. 65(c) as the injunction is unlikely to cause the School Defendants to suffer costs and damages if they are wrongly enjoined.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 7th day of January, 2021.

Christina Reiss, District Judge
United States District Court